# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XMTT, INC.,

        Plaintiff,

    v.

INTEL CORPORATION,

        Defendant.

Civil Action No. 18-1810 (MFK)

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

---

## PLAINTIFF XMTT'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

---

Dated: December 22, 2022

Morgan Chu (admitted *pro hac vice*)
Benjamin Hattenbach (admitted *pro hac vice*)
Anthony Rowles (admitted *pro hac vice*)
Jordan Nafekh (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199
mchu@irell.com
bhattenbach@irell.com
trowles@irell.com
jnafekh@irell.com

Philip Warrick (admitted *pro hac vice*)
IRELL & MANELLA LLP
750 17th Street NW, Suite 850
Washington, DC 20006
Tel. (202) 777-6500
Fax (310) 203-7199
pwarrick@irell.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*ATTORNEYS FOR PLAINTIFF XMTT, INC.*

11173416

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 1

II.    SUMMARY OF XMTT'S ARGUMENTS ...................................................................... 1

    A.    Motions For Summary Judgment .......................................................................... 1

    B.    *Daubert* Motions .................................................................................................. 1

III.    STATEMENT OF THE FACTS ....................................................................................... 3

IV.    XMTT'S MOTIONS FOR SUMMARY JUDGMENT .................................................. 4

    A.    Legal Standard ....................................................................................................... 4

    B.    XMTT Is Entitled To Summary Judgment On Its Doctrine Of
Equivalents Theory That There Is No Prosecution History Estoppel
And No Ensnarement ............................................................................................. 4

    C.    The Court Should Grant Summary Judgment That IPR Estoppel Bars
Each of Intel's Prior Art Grounds Asserted Against the '388 Patent ................... 6

        1.    IPR Estoppel Precludes Intel's Reliance on the Merrimac
System ...................................................................................................... 7

        2.    IPR Estoppel Precludes Intel's Reliance on the Cell Broadband
Engine System ......................................................................................... 8

        3.    IPR Estoppel Precludes Intel's Reliance on Intel's Gen4
Products ................................................................................................... 9

    D.    XMTT Is Entitled To Summary Judgment That Intel Cannot Challenge
XMTT's Ownership Of The Asserted Patents .................................................... 10

V.    XMTT'S *DAUBERT* MOTIONS ................................................................................ 11

    A.    Legal Standard ..................................................................................................... 11

    B.    Drs. Kogge and Aamodt Should Be Precluded from Applying Incorrect
Claim Constructions ........................................................................................... 11

    C.    Ms. Davis's Unreliable "Comparable" License Opinion Should Be
Excluded ............................................................................................................. 15

**Page**

D.    Assertions That Damages Are Limited to the "Integrated Graphics Portion" of the Accused Processors Are Improper And Unreliable For Numerous Reasons And Should Be Excluded ....................................................... 19

E.    Damages Should Not Be Limited To An Arbitrary Internal Accounting Rate Determined By Intel Without Regard To The Value Of XMTT's Patents ................................................................................................................ 21

F.    Damages Should Not Be Limited to a Fraction of the Alleged Infringement by Refusing to Fully Assume Infringement in the Hypothetical Negotiation ..................................................................................... 23

G.    Intel's Experts Should Be Precluded From Relying On The Existence Of Intel's Own Patents To Purportedly Limit Damages ..................................... 25

H.    Intel's Experts Should Be Precluded From Asserting That Damages Are Restricted To Benefits Expressly Discussed In The Patent Specifications ..................................................................................................... 28

I.    Intel's Experts Should Be Precluded From Reducing Damages By One-Third Based On An Arbitrary "Two Out Of Three Pipelines" Theory .............. 29

J.    Intel's Experts Should Be Precluded From Testifying About Hypothetical Non-Infringing Alternatives That Were Not Available Or Acceptable Do Not Limit Damages ..................................................................... 34

1.    Dr. Kogge Should Be Precluded From Testifying About Alternatives Not Shown To Be Available And Acceptable .................... 34

2.    Ms. Davis Should Be Precluded From Relying On Alternatives Not Shown To Be Available And Acceptable ........................................ 36

3.    Ms. Davis Should Be Precluded From Confusing The Jury With Irrelevant Testimony ................................................................................. 37

K.    Dr. Perryman's Unreliable Methodology and Inconsistently Applied Forward-Citation Analysis Should Be Excluded ................................................. 37

VI.    CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v Motorola Inc.*,
757 F.3d 1286 (Fed. Cir. 2014)......................................................................................21

*AstraZenecaAB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)......................................................................................21

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
455 F.3d 195 (3d. Cir. 2006)..........................................................................................11

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011)........................................................................................15

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996)........................................................................................26

*California Inst. of Tech. v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) ..........................................................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..........................................................................................................4

*Conroy v. Reebok Int'l, Ltd.*,
14 F.3d 1570 (Fed. Cir. 1994)..........................................................................................6

*Cordis Corp. v. Medtronic Ave, Inc.*,
511 F.3d 1157 (Fed. Cir. 2008)........................................................................................5

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
424 F.3d 1168 (Fed. Cir. 2005)......................................................................................13

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009)....................................................................................4, 5

*Dorr-Oliver, Inc. v. United States*,
432 F.2d 447 (Ct. Cl. 1970) ...........................................................................................10

*Eli Lilly & Co. v. Apotex, Inc.*,
837 F. App'x 780 (Fed. Cir. 2020)...................................................................................5

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009)......................................................................................12

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
   879 F.3d 1332 (Fed. Cir. 2018)...................................................................32

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   No. 13-CV-03999-BLF, 2015 WL 4272870 (N.D. Cal. July 14, 2015)...................................38

*Free Motion Fitness, Inc. v. Cybex Inter., Inc.*,
   423 F.3d 1343 (Fed. Cir. 2005)...........................................................14, 15

*Guardant Health, Inc. v. Found. Med., Inc.*,
   No. CV 17-1616-LPS-CJB, 2020 WL 2461551 (D. Del. May 7, 2020) ..........................31, 32

*Int'l Visual Corp. v. Crown Metal Mfg. Co.*,
   991 F.2d 768 (Fed. Cir. 1993)...............................................................6

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
   No. CV 18-4522022 ...........................................................16

*King Instruments Corp. v. Perego*,
   65 F.3d 941 (Fed. Cir. 1995)...........................................................29

*Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*,
   232 F. Supp. 3d 632 (D. Del. 2017)...........................................................12

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   No. 2:06-CV-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011)...................................32, 34, 35

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006)...........................................................12

*LoganTree LP v. Garmin Int'l, Inc.*,
   No. 17-1217, 2022 WL 6728014 (D. Kan. Oct. 11, 2022) .......................................27

*Lucent Techs. Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)...........................................................23

*Medline Indus., Inc. v. C.R. Bard, Inc.*,
   No. 17 C 7216, 2020 WL 5512132 (N.D. Ill. Sept. 14, 2020)...................................7

*Mercantile Nat'l Bank of Chicago v. Howmet Corp.*,
   524 F.2d 1031 (7th Cir.1975) ...........................................................10

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
   271 F. Supp. 3d 990 (E.D. Wis. 2017)...........................................................8

*Minerva Surgical, Inc. v. Hologic, Inc.*,
   No. CV-18-217-JFB-SRF, 2021 WL 3048447 (D. Del. July 20, 2021)
   (collecting Delaware cases) ...........................................................11

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F. 4th 1358 (Fed. Cir. 2021) ...................................................................16

*NetFuel, Inc. v. Cisco Sys. Inc.*,
  No. 5:18-cv-02352, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ........................32

*Nomadix, Inc. v. Hewlett-Packard Co.*,
  No. CV 09-08441, 2012 WL 1577436 (C.D. Cal. May 7, 2012) ...........................10

*Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.*,
  No. 15 C 1067, 2019 WL 861394 (N.D. Ill. Feb. 22, 2019)....................................7

*Omega Patents, LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) ....................................................................16

*Open Text S.A. v. Box, Inc.*,
  Case No. 13-cv-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ...............31

*PalTalk Holdings, Inc. v. Microsoft Corp.*,
  No. 2:06-CV-367, 2009 WL 10677783 (E.D. Tex. Feb. 25, 2009).........................28

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)....................................................................20

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
  989 F. Supp. 547 (D. Del. 1997)...................................................................23

*Realtek Semiconductor Corp. v. LSI Corp.*,
  2014 WL 46997 (N.D. Cal. Jan. 6, 2014).......................................................39

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010).....................................................................15

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
  No. 17-cv-1023, 2020 WL 1283465 (W.D. Pa. March 18, 2020) ..........................34

*Sonos, Inc. v. D&M Holdings Inc.*,
  No. CV 14-1330, 2017 WL 5633204 (D. Del. Nov. 21, 2017) .............................27

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015).....................................................................38

*TC Tech. LLC v. Sprint Corp.*,
  379 F. Supp. 3d 305 (D. Del. 2019)..................................................................4

*ThinkOptics, Inc. v. Nintendo of Am., Inc.*,
  Case No. 6:11-cv-455, 2014 WL 2859578 (E.D. Tex. June 21, 2014)............21, 25

*Vaporstream, Inc. v. Snap Inc.*,
    No. 217CV00220, 2020 WL 136591 (C.D. Cal. Jan. 13, 2020).............................................6, 9

*Wasica Fin. GmbH v. Schrader Int'l, Inc.*,
    432 F. Supp. 3d 448 (D. Del. 2020).......................................................................................7

*Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*,
    No. 16-CV-13456, 2019 WL 3334563 (E.D. Mich. July 25, 2019) .......................................25

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    365 F. Supp. 3d 466 (D. Del. 2019).......................................................................................18

**Statutes**

35 U.S.C. § 271(a) ...................................................................................................................24

35 U.S.C. § 284..............................................................................................................23, 29, 38

35 U.S.C. § 315(e)(2)...............................................................................................................1, 6

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................4

Fed. R. Evid. 702(a)...................................................................................................................11

Fed. R. Evid. 702(b)–(d).............................................................................................................11

\*Exhibits are attached to the declaration of Anthony Rowles, filed concurrently herewith.

\*\*All emphasis to quotations is added unless otherwise indicated.

## I.     NATURE AND STAGE OF THE PROCEEDINGS

XMTT's complaint asserts that Intel infringes U.S. Patents 7,707,388 and 8,145,879 D.I. 1.  Fact discovery closed on July 8, 2022.  D.I. 256.  Expert discovery closed on December 19, 2022.  D.I. 327.  Trial is currently set for April 24, 2023.  D.I. 256.

## II.    SUMMARY OF XMTT'S ARGUMENTS

### A.     Motions For Summary Judgment

1.     XMTT seeks summary judgment that prosecution history estoppel is not available as a defense to XMTT's claims for infringement under the doctrine of equivalents.  Prosecution history estoppel only applies where claims were amended during prosecution, or where arguments were made in prosecution that evidence a clear and unmistakable surrender of subject matter.  No such events occurred during the prosecution of XMTT's patents.

2.     XMTT seeks summary judgment that ensnarement is not available to Intel as a defense to XMTT's claims for infringement under the doctrine of equivalents.  Intel's experts chose not to substantively address ensnarement in any of their reports, and expert discovery is closed.

3.     XMTT seeks summary judgment that statutory IPR estoppel under 35 U.S.C. § 315(e)(2) bars Intel from asserting invalidity of the '388 Patent based on "systems" or "products" described in prior art patents or printed publications that it could have submitted in its IPR petition.

4.     XMTT seeks summary judgment Intel cannot challenge XMTT's ownership of the asserted patents.  XMTT is indisputably the assignee of the asserted patents, and Intel lacks standing to challenge ownership on behalf of a third party.

### B.     *Daubert* Motions

5.     XMTT moves to preclude Drs. Kogge and Aamodt from offering opinions based on incorrect claim constructions.  Specifically, both experts purport to offer their own constructions of "serial processing mode"—a term already construed, as part of a larger phrase, by

the Court—and argue non-infringement based on their own interpretations of the claims rather than the Court's.  They also attempt to narrow the claimed apparatus to processing a "single" software program based on the use of articles "a" and "the," contrary to Federal Circuit law that those terms presumptively mean "one or more" when used in claims.

6.     XMTT moves to preclude Ms. Davis from relying on licenses with numerous undisputed differences from the hypothetical negotiation where she did not make any adjustments to account for those differences as the law requires.

7.     XMTT moves to preclude Intel's experts from presenting damages analyses improperly limited to the "integrated graphics" portion of the accused Intel processors rather than the full scope of the asserted patent claims.

8.     XMTT moves to preclude Intel's experts from improperly reducing damages using

█████████████████████████████████████████████████████████████ and otherwise failing to anchor their damages analysis in the "use made of the invention by the infringer" as required by the damages statute.

9.     XMTT moves to preclude Intel's damages expert, Ms. Davis, from attempting to reduce damages by failing to assume infringement as required by law for her damages analyses, and instead assuming that approximately ███ of the accused Intel products do not infringe.

10.     XMTT moves to preclude Intel's experts from asserting that the existence of certain Intel patents limits damages.  Intel's experts admitted that they have no idea whether any Intel products, including the accused products, have ever practiced those patents.  Any reliance on those Intel patents is therefore unsupported and unreliable.

11.     XMTT moves to preclude Intel's experts from asserting that damages are limited to examples of benefits explicitly described in preferred embodiments in the specifications of the

asserted patents.  Patent damages are typically based on the value the claimed inventions provide the infringer, not non-limiting examples from a specification.

12.     XMTT moves to preclude Intel's experts from asserting that damages should be apportioned based on Dr. Kogge's "2/3 pipelines" theory.  Briefly, Dr. Kogge had asserted that the patents are limited solely to integrated graphics, that integrated graphics in the accused processors consist of three pipelines, that only two of them are implicated by the asserted patents, and accordingly that any damages should be apportioned by two-thirds.  However, as Dr. Kogge admitted at his deposition, the patents are not limited to integrated graphics at all, leaving his argument without a proper premise.  Further, even if the patents had been so limited, no reliable methodology supports Dr. Kogge's assumption that each pipeline is equally valuable.

13.     XMTT moves to preclude Intel's experts from relying on certain hypothetical products as non-infringing alternatives.  Intel's expert Dr. Kogge points to hypothetical products without ever showing that they were available to Intel, and admitted that he did not consider the costs associated with developing any of them.  Accordingly, no reliable methodology supports reliance on these alleged products as non-infringing alternatives to the patented technology.

14.     XMTT moves to preclude Intel's experts from relying on "forward citation analysis" that purports to value patents based solely on the number of times they have been cited by other patents, without regard to the nature or scope of infringement or the benefits the inventions provided to Intel.  Both the methodology and its execution are unreliable.

## III.    STATEMENT OF THE FACTS

The undisputed facts relevant to XMTT's motions for summary judgment are as follows:

1.     No amendments were made to the claims during prosecution of the applications that led to the patents in suit.  Exs. 2, 3.

2.     No arguments were made evidencing a clear and unmistakable surrender of subject

matter during prosecution of either aforementioned application.  Exs. 2, 3.

3.      Both the '388 Patent and the '879 Patent are assigned to XMTT.  Exs. 2, 3.

4.      The University of Maryland has never asserted any ownership interest in the '388 or '879 Patents, or assigned any rights relating to the '388 or '879 Patents to Intel.

5.      Intel's petition for *inter partes* review of the '388 Patent culminated in a final written decision on May 11, 2021, finding none of the challenged claims unpatentable.  Ex. 23.

The relevant facts for XMTT's *Daubert* motions are described in the motions below.

## IV.    XMTT'S MOTIONS FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is warranted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[T]he court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *TC Tech. LLC v. Sprint Corp.*, 379 F. Supp. 3d 305, 312 (D. Del. 2019).

### B.    XMTT Is Entitled To Summary Judgment On Its Doctrine Of Equivalents Theory That There Is No Prosecution History Estoppel And No Ensnarement

XMTT asserts that the "serial processor" element in the asserted claims is infringed under the doctrine of equivalents.  *See e.g.*, Ex. 1 (Conte Opening Report), at ¶¶ 192-99.  Intel suggests it may argue these positions are barred by prosecution history estoppel or ensnarement.  Both issues are questions of law.  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323 (Fed. Cir. 2009).  No evidence supports either theory.  Summary judgment is warranted.

With respect to prosecution history estoppel, a fundamental requirement of the defense is that subject matter was surrendered by the patentee during prosecution by claim amendment or argument.  *See, e.g.*, *Eli Lilly & Co. v. Apotex, Inc.*, 837 F. App'x 780, 784 (Fed. Cir. 2020) ("A

narrowing amendment is required to invoke estoppel."); *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) ("[A]rgument-based disavowals will be found . . . only if they constitute clear and unmistakable surrenders of subject matter.").  Here, no claims of the asserted patents were amended during prosecution and no arguments were made to overcome patentability rejections.  The '388 patent claims were issued on the first office action and the '879 patent claims were issued after a terminal disclaimer was filed, obviating a double-patenting rejection.  Exs. 2-3 ('388 Patent File History & '879 Patent File History); *see also* Ex. 4 (Kogge Dep. Tr.) at 118:13-18 (Intel's expert unable to identify any arguments made during prosecution to overcome patentability rejections).  Accordingly, prosecution history estoppel plainly does not apply.

With respect to ensnarement, equivalents are barred only if the patentee is "asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art." *DePuy Spine*, 567 F.3d at 1322.  In his opening expert report, Dr. Conte explained that his application of the "serial processor" claim term under the doctrine of equivalents "does not encompass the prior art" at least because "the manner in which [he is] reading this claim term on the Accused Products differs from the teaching of the alleged prior art cited by Intel."  Ex. 1, at ¶ 198.

There is no contrary evidence, because Intel's experts chose not to substantively respond to Dr. Conte's ensnarement opinions (having been incorrectly informed by counsel that no response is required until the plaintiff presents a "hypothetical claim" to analyze.  *See e.g.* Ex. 5 (Kogge Rebuttal Report), at ¶¶ 13, 267.  However, the law is clear that a "[h]ypothetical claim analysis is an **optional** way of evaluating whether prior art limits the application of the doctrine of equivalents." *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 772 (Fed. Cir. 1993); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1576 (Fed. Cir. 1994) ("While the hypothetical claim analysis is a useful methodology . . . nothing in *Wilson* mandates its use as the only means

for determining the extent to which the prior art restricts the scope of equivalency.").

>   **C.    The Court Should Grant Summary Judgment That IPR Estoppel Bars Each of Intel's Prior Art Grounds Asserted Against the '388 Patent**

Intel sought, and obtained, a stay of this case on the theory that "regardless of the outcome of the instituted IPR involving the '388 patent, that IPR will streamline this case" because "once the IPR reaches a final written decision, Intel will be subject to a statutory estoppel that prevents it from raising in this litigation any ground of unpatentability against the '388 patent that Intel 'raised or reasonably could have raised during . . . inter partes review.'"  D.I. 129, at 5 (quoting 35 U.S.C. § 315(e)(2)).  Now that Intel's IPR has concluded with no claims invalidated, it is seeking another bite at the apple in front of the jury by asserting three prior art grounds that it could have raised in an IPR: references it refers to as "Merrimac," "Cell Broadband Engine," and "Gen4."

The Federal Circuit has made clear that "estoppel applies . . . to all grounds not stated in the petition but which reasonably could have been asserted against the claims included in the petition."  *California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022). As discussed further below, each of Intel's '388 Patent prior art grounds is, by Intel's own admission, based on disclosures in patents or printed publications that Intel could have asserted against the claims it challenged in the IPR.

To the extent that Intel argues that it is relying here on "systems" rather than "printed publications," it cannot avoid estoppel through creative labeling.  "Several district courts have held that if a patent challenge is simply swapping labels for what is otherwise a patent or printed publication invalidity ground in order to cloak its prior art ground and skirt estoppel, then § 315(e)(2) estoppel still applies."  *Vaporstream, Inc. v. Snap Inc.*, No. 217CV00220, 2020 WL 136591, at *23 (C.D. Cal. Jan. 13, 2020).  "Where there is evidence that a petitioner had reasonable access to printed publications corresponding to or describing a product that it could have proffered

during the IPR process, it cannot avoid estoppel simply by pointing to its finished product (rather than the printed materials) during litigation." *Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.*, No. 15 C 1067, 2019 WL 861394, at *10 (N.D. Ill. Feb. 22, 2019).  Indeed, "moving from a printed publication (such as a manual describing a device) in an IPR proceeding to a physical product (such as the device described in the manual) in litigation merely swaps evidentiary proofs supporting the same 'ground' for invalidity that was raised or reasonably could have been raised during the IPR." *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 453 (D. Del. 2020).  Even courts that have interpreted estoppel more narrowly nonetheless preclude defendants from "improperly attempting to disguise a ground that could have been raised during the IPR as one that could not have been raised." *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *5 (N.D. Ill. Sept. 14, 2020).  Accordingly, Intel is statutorily estopped from asserting each of its alleged prior art grounds for the '388 Patent, as each is, at best, disguised version of an invalidity ground that it reasonably could have raised in its IPR petition.

### 1.    IPR Estoppel Precludes Intel's Reliance on the Merrimac System

Intel relies solely on published documents to describe the Merrimac system.  Intel at minimum could have located and cited the papers that Stanford published on the internet, describing that system, over a decade before Intel's 2019 IPR petition.  *See* Ex. 11 (Kogge Opening Report, Appendix C-388), at ¶ 131 (listing solely published documents, including two Stanford reports from 2004 and 2005 with hyperlinks to Stanford's server).  Intel plainly could have located these publications and should have been well aware of the Stanford Merrimac project.

The Stanford links were active and available at least as early as 2014, as evidenced by the Internet Archive, *see* Ex. 12 (Wayback Machine PDF).  Intel plainly could have located these publications by a leading academic institution and had every reason to do so well before it filed its IPR petition; for example, the '388 prosecution history includes two publications from the Stanford

Computer Science Lab by co-authors of the Merrimac papers that Dr. Kogge cites (Bill Dally and Jayanth Gummaraju) and both specifically reference Merrimac by name. *See* Ex. 13 (Daily Seminary Presentation); Ex. 14 (Gummaraju Paper).

Indeed, Dr. Kogge can only be relying on publications describing Merrimac because, as he admitted at deposition, ████████████████████████████████████████ Ex. 4 (Kogge Dep. Tr.), at 148:10-16. Dr. Kogge thus conceded he was relying on the description in the published papers, rather than any alleged "system" known or used in the prior art. *See id.* at 148:17-20 ████████████████████████████████████████████ ████████████████████████. Dr. Kogge's Merrimac ground thus falls squarely within the scope of estoppel. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1032 (E.D. Wis. 2017) ("To the extent these written materials fall within the scope of Section 311(b), they are of course affected by IPR estoppel. [Defendant] cannot skirt it by purporting to rely on a device without actually relying on the device itself.").

## 2.    IPR Estoppel Precludes Intel's Reliance on the Cell Broadband Engine System

The Cell Broadband Engine System was an actual product, but once again here, Intel's arguments rest on printed publications under § 311(b). ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████ In other words, Intel itself described these documents as "publications" and should not be heard to suggest otherwise now. *See Vaporstream*, 2020 WL 136591, at *24 (rejecting the

argument that invalidity contentions used the word "system" because the defendants described the specific references as "patents and publications").  Moreover, while Intel cites various forms of evidence in connection with this system, when Intel's expert Dr. Kogge was asked ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Ex. 4, at 149:23-150:4.  Thus, Intel's positions here are the same positions it could have raised in its IPR petition based entirely on published documents.  This is not the first time a litigant has attempted to circumvent IPR estoppel in this manner, but it is plainly improper; "[s]everal district courts have held that the identification of prior art in an accused infringer's invalidity contentions generated prior to the filing of the IPR petition is sufficient to establish as matter of law . . . that the references 'reasonably could have [been] raised' in the IPR."  *Id.* at *25.  Intel served its Initial Invalidity Contentions several months before its IPR petition, and therefore reasonably could have raised these arguments.

### 3.  IPR Estoppel Precludes Intel's Reliance on Intel's Gen4 Products

Like the Cell Broadband System, Intel disclosed ████████████████

████████████████████████████████████████████

████████ in its July 12, 2019 Initial Invalidity Contentions, well before filing its IPR petition in November 2019.  *See* Ex. 15, at 10-13.  Intel plainly could have included its own prior art publications in its IPR petition.  Although some of these documents were published after the filing date of the '388 Patent, according to Intel's expert Dr. Kogge, ████████████████

████████████████████████████████████ Ex. 8 (Kogge Opening Report), ¶ 322.  Dr. Kogge also testified that several Intel patents that are prior art to the '388 Patent describe the Gen4 System.  *See* Ex. 4, at 151:12-155:5 (referencing patents listed at Ex. 5 (Kogge Rebuttal Report), ¶ 661).  Dr. Kogge further testified that the ***Intel patents predating***

the '388 Patent ███████████████████████████████ Ex. 4, at 222:14-224:10.

Intel plainly could have used these patents to present the same invalidity arguments in its IPR petition.  Estoppel therefore applies.

### D. XMTT Is Entitled To Summary Judgment That Intel Cannot Challenge XMTT's Ownership Of The Asserted Patents

XMTT is indisputably the assignee of the asserted patents, as alleged in the complaint. *See* D.I. 1, ¶ 2 ("XMTT is the assignee and owns all right, title, and interest to [the asserted patents]."); Ex. 2 ('388 Patent File History), at XMTT00000201, Ex. 3 ('879 Patent File History), at XMTT00000295.  Intel's pleadings raise no challenge to XMTT's ownership.  *See* D.I. 271 (Intel's First Amended Answer which does not plead any alleged lack of ownership).  However, despite failing to challenge XMTT's ownership of the patents in its pleadings, Intel now seeks to inject that issue into trial via its invalidity expert, Dr. Kogge, whose report includes a lengthy section titled "Ownership Of The Patents-In-Suit" that speculates that the University of Maryland may have certain ownership rights in the asserted patents by virtue of its IP policies and employment relationship with Dr. Vishkin.  *See* Ex. 8 (Kogge Opening Report), at Section VI.E.

Even if Dr. Kogge's assertions had merit—and they do not—Intel has no standing to challenge XMTT's ownership rights based on an assertion that the University of Maryland, which is not a party to this suit, may be entitled to certain rights. [1]  *Dorr-Oliver, Inc. v. United States*, 432

---

[1] Dr. Kogge's opinions are also excludable under *Daubert*, as he offers no more than a legal opinion relating to contractual rights.  "[A]n expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d. Cir. 2006).  Indeed, this opinion appears to have been written by counsel, as Dr. Kogge was wholly unfamiliar with it at his deposition.  Ex. 4 (Kogge Dep. Tr.), at 144:9-16 ████████████████████████████████████ ██████████████████████████████████████████████  In any event, Dr. Kogge's opinions are irrelevant (and therefore unhelpful to the trier of fact) in view of Intel's lack of standing to challenge XMTT's ownership of the patents-in-suit at trial.

F.2d 447, 451 (Ct. Cl. 1970) ("In patent litigation between private parties, equitable rights of ownership of strangers to the suit cannot be raised as defenses against the legal titleholder of a patent."); *Nomadix, Inc. v. Hewlett-Packard Co.*, No. CV 09-08441, 2012 WL 1577436, at *3 (C.D. Cal. May 7, 2012) ("Unlike legal title, 'a third party's equitable rights in a patent may not be asserted as a defense in an action for infringement brought by the owner of title to the patent.'") (quoting *Mercantile Nat'l Bank of Chicago v. Howmet Corp.,* 524 F.2d 1031, 1034 (7th Cir.1975)). *See also* Ex. 4, (Kogge Dep. Tr.) at 147:20-23 ███████████████████████████████████████████████████████████████████████████████████████ .

Intel's new theory that XMTT is not the owner of the asserted patents is thus either waived by failure to plead or legally inoperative due to Intel's lack of standing to assert such a defense.  In either case, XMTT is entitled to judgment as a matter of law that Intel cannot challenge XMTT's ownership of the asserted patents, or at minimum that XMTT's ownership should be treated as an established fact in this case.

## V.      XMTT'S *DAUBERT* MOTIONS

### A.      Legal Standard

Expert testimony is permissible only where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d).  Expert testimony that does not meet these requirements should be excluded.

### B.      Drs. Kogge and Aamodt Should Be Precluded from Applying Incorrect Claim Constructions

In this district, "[t]he opinions of a patent infringement expert who applies an erroneous

claim construction are inadmissible." *See, e.g.*, *Minerva Surgical, Inc. v. Hologic, Inc.*, No. CV-18-217-JFB-SRF, 2021 WL 3048447, at *6 (D. Del. July 20, 2021) (collecting Delaware cases). The Federal Circuit has similarly affirmed exclusion of expert testimony, as irrelevant, that is "based on an impermissible claim construction." *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006).  Here, Intel's non-infringement experts Drs. Kogge and Aamodt offer non-infringement opinions based on incorrect claim constructions in two ways.

*First*, they present non-infringement arguments based on their own purported interpretation of the "ordinary meaning" of "serial processing mode," which was already construed (as part of a larger phrase) by the Court.  Specifically, the Court construed the phrase "prior to a transition from a serial processing mode to a parallel processing mode" to mean "before the point in time when the plurality of parallel processors take over processing the software instructions in the software program from the serial processor and execute instructions in the software program in parallel." D.I. 117, at 3.[2]  The term "serial processing mode" does not appear in the Court's construction, nor do the asserted claims use "serial processing mode" in any other context besides the phrase already construed by the Court.  There is thus no basis for either Dr. Kogge or Dr. Aamodt to testify to the jury regarding their interpretation of the "ordinary meaning" of "serial processing mode," and those opinions should be excluded.  *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("No party may contradict the court's construction to a jury."); *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 635 (D. Del. 2017) (striking "expert testimony that is inconsistent with the Court's claim construction [as] unreliable and unhelpful to the finder of fact").

---

[2] Intel later moved the Court to revisit claim construction and construe "serial processing mode" as "a mode where the system executes largely but not wholly in serial on the serial processor," but that request was denied. *See* D.I. 293, at 4.

For example, Dr. Kogge's non-infringement report includes an entire section dedicated to "The Ordinary Meaning Of 'Serial Processing Mode'" where he asserts that because the Court

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ *See*

Ex. 5 (Kogge Rebuttal Report), at ¶¶ 278-84.  Dr. Kogge then concludes, based on his analysis of the patent specification and other materials, that ███████████████████████████████

██████████████████████ and goes on to explain why, in his view, the accused products do not satisfy Dr. Kogge's interpretation of "serial processing mode."  *See id*., at ¶¶ 284-300.  Dr. Kogge further criticizes XMTT's expert, Dr. Conte, for failing to █████████████████████

████████████████████████████████—because Dr. Conte, consistent with the Court's orders, applied the Court's construction of the "prior to a transition from a serial processing mode…" phrase rather than offering his own construction of "serial processing mode."  *See, e.g.*, *id*., at ¶¶ 301-04; Ex. 1 (Conte Opening Report), at ¶¶ 248-260.

Similarly, Dr. Aamodt, after reciting the Court's construction of the phrase including "serial processing mode," states: ████████████████████████████████████████████

██████████████████████████████████████████ Ex. 9 (Aamodt Report), at ¶¶ 258-59.  Like Dr. Kogge, Dr. Aamodt then goes on to provide his own construction of "serial processing mode" based on the specification and argue that the accused processors lack such a "serial processing mode."  *Id.,* ¶¶ 259-264.

Intel's experts' arguments about the ordinary meaning of "serial processing mode," their non-infringement assertions based on their constructions of "serial processing mode," and their criticisms of Dr. Conte for applying the Court's construction instead of separately identifying a "serial processing mode" are all irrelevant and unhelpful to the trier of fact and should be excluded

to avoid the risk of confusing the jury as to what construction should govern at trial.  *See CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) ("The risk of confusing the jury is high when experts opine on claim construction before the jury even when, as here, the district court makes it clear to the jury that the district court's claim constructions control.").

      *Second*, Drs. Kogge and Aamodt argue that because the asserted claims recite one processor executing instructions in "*a* [software/computing] program" and another processor executing instructions in "*the* [software/computing] program," the claims are limited to "execution of a *single* program."  *See* Ex. 5, at ¶¶ 367-68; Ex. 9, at ¶¶ 236-38.  Both experts confirmed that they based this "single program" interpretation on the claims' use of singular articles "a" and "the."  *See* Ex. 4 (Kogge Dep. Tr.), at 137:9-17 ████████████████████████████████

████████████████████████████████████████████████; Ex. 10 (Aamodt Dep. Tr.), 307:11-18 ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████.  Both experts argue that the accused products do not infringe because the alleged processors do not execute instructions in the same, singular program.  *See* Ex. 5, at ¶¶ 371-81; Ex. 9, at ¶¶ 239-51.

      Intel's experts' opinions based on narrowing the claims to a "single program" are contrary to Federal Circuit law, are based on arguments that were never made during the claim construction process and were therefore waived, and for both reasons should be excluded.  All of the asserted claims use the transitional phrase "comprising" between the preamble and the elements, indicating an open-ended claim.  *See, e.g.*, '879 Pat., cl. 1 ("An apparatus comprising: a serial processor to execute instructions in a computing program primarily in serial…").  It is well-established that the articles "'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims

- 14 -

containing the transitional phrase 'comprising.'" *Free Motion Fitness, Inc. v. Cybex Int'l., Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005). Similarly, the subsequent use of the definite article "the" "is afforded the same presumptive meaning of 'one or more' when used with the transitional phrase 'comprising.'" *Id.* While this convention can be overcome in rare circumstances, such as where "the claim is specific as to the number of elements" or "when the patentee evinces a clear intent to…limit the article" (*see id.*), Intel sought no such construction from the Court here and it is too late to do so now, through the testimony of rebuttal experts at trial. *See, e.g.*, *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 640-41 (Fed. Cir. 2011) (finding waiver where party "had ample opportunity to seek construction" of a limitation during the scheduled claim construction process and affirming district court's exclusion of "new claim construction theories on the eve of trial").

## C.     Ms. Davis's Unreliable "Comparable" License Opinion Should Be Excluded

Intel's damages expert, Ms. Davis, provides an affirmative opinion relating to the "amount of the royalty" Intel would agree to pay XMTT in a hypothetical negotiation for a license to the patents in suit. For that opinion, she purports to rely on two allegedly comparable agreements— one with a company named ███ and another with a company named ███. Ex. 6 (Davis Report), at 82. These are cherry-picked agreements in which Intel agreed to pay ███████████ for certain IP rights. Ms. Davis relies on them to create a false appearance of support for her affirmative opinion about the "amount of the royalty" Intel would have agreed to pay XMTT in a hypothetical negotiation for a license to the patents in suit. The problem with Ms. Davis' approach is that these other agreements were entered into in considerably different circumstances and provided extraordinarily different rights than would have been at issue in the hypothetical negotiation, yet Ms. Davis excerpted and applied numbers from the agreements without even attempting to account for any of those major differences.

The Federal Circuit has "long required district courts performing reasonable royalty

calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (vacating damages award because "the district court erred by considering ResQNet's re-bundling licenses . . . ***without any factual findings that accounted for the technological and economic differences between those licenses and the '075 patent***."). "[P]rior licenses or settlements need to be 'sufficiently comparable' for evidentiary purposes and any differences in circumstances must be soundly accounted for." *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F. 4th 1358, 1375 (Fed. Cir. 2021) (affirming district court's grant of *Daubert* motion to exclude damages expert's reasonable royalty opinion because the expert "provided no evidence or explanation for how the 0.25% royalty rate he derived from the [allegedly comparable] agreement accounts for apportionment of Micron's accused products.").

Thus, where allegedly comparable agreements are used in such analyses, but they have material differences from the facts of the hypothetical negotiation, it is elementary that an expert must account for those differences. *See Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1381 (Fed. Cir. 2021) (granting motion for a new trial on damages because despite "Omega separately suggest[ing] that it met its obligation to account for distinguishing facts on the basis that Mr. Flick 'described the details, similarities[,] and differences between and among the licenses' . . . [because] Mr. Flick's (and Mr. Tregillis's) generic testimony simply does not 'account[ ] for the technological and economic differences between th[e] licenses' and a hypothetical negotiation over a single, specific patent."); *IOENGINE, LLC v. PayPal Holdings, Inc.*, No. CV 18-4522022 WL 2800861, *22 (D. Del. June 15, 2022) (excluding expert testimony because "[a]lthough a license need not be 'perfectly analogous' in order to be comparable, the expert must nevertheless account for any differences between the license and the royalty agreement that would be expected

to flow from a hypothetical negotiation involving the patents in suit.").

Ms. Davis agrees, in concept.  In her report, she acknowledged that 

Ex. 6, at 61.  Indeed, she even criticizes XMTT's damages expert for not making such adjustments to her satisfaction.  For instance, she criticizes XMTT's expert Dr. Sullivan for using a rate from another agreement (which unlike her agreements, was for a license to the patents in suit), falsely asserting that

*Id.* at 110; *see also id.* at 114

[3]

Despite universal agreement that an expert must "make reliable adjustments" to account for differences between a prior license and the hypothetical negotiation before applying terms from the prior license to a hypothetical negotiation, ***Ms. Davis did not make any such adjustments***.  Instead, she outright admitted that there are ***numerous***, ***substantial*** differences between her two allegedly comparable licenses and the hypothetical negotiation, and that she did ***not*** take any steps to account for any of them.

---

[3] Dr. Sullivan did in fact adjust the rate to account for differences between that agreement and the hypothetical negotiation, as he explained in his report and confirmed during deposition.



---

[4] Ms. Davis' reliance on Dr. Kogge cannot save her opinions, either.  Dr. Kogge was similarly unable to say whether Intel had ever used any of the technology purportedly licensed from ▓▓ or ▓▓▓▓.  He also performed no analysis of the specific claimed inventions purportedly licensed by Intel, instead admitting that he generally only ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Ex. 4, at 194:6-19, 192:24-195:22.  There is nothing in Dr. Kogge's technical analysis supporting Ms. Davis' choice to perform no adjustments whatsoever to account for differences between the allegedly comparable licenses and the patents-in-suit.  *See Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 495-96 (D. Del. 2019) ("us[ing] broad and nebulous language to describe the technological comparability," or simply "generally identif[ying] the subject matter of the [agreements]," is insufficient to show technological comparability).

These differences are plainly substantial.  Nonetheless, despite Ms. Davis' recognition that

licenses 

***Ms. Davis never made any adjustments whatsoever to account for any differences between these agreements and the hypothetical negotiation***.

This is similarly undisputed.  Her report is entirely devoid of any adjustments to account for the differences between either of her agreements and the hypothetical negotiation.  And Ms. Davis left no doubt in her deposition.  She explicitly admitted that she

*Id.* at 301:22-302:2.  *See also id.* at 300:18-22

.  Indeed, she admitted that she ***did not even try*** to quantify an adjustment for such differences.  *Id.* at 294:25-295:4.

Because Ms. Davis failed to account for the significant differences between her agreements and the hypothetical negotiation, her opinions relying on the terms of those licenses to project the outcome of the hypothetical negotiation are unreliable and should be excluded.

> **D.** **Assertions That Damages Are Limited to the "Integrated Graphics Portion" of the Accused Processors Are Improper And Unreliable For Numerous Reasons And Should Be Excluded**

Intel's damages expert, Ms. Davis, admitted that she based her damages analysis on something less than the full scope of the asserted claims.  *See, e.g.*, Ex. 7 (Davis Dep. Tr.), at 193:10-20

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████; Ex. 6, at 18 ███████████████████████

████████████████████████████████████  This approach of valuing only a

fraction of the patented invention, rather than the full invention claimed, defies the "bedrock

principle of patent law that the claims of a patent define the invention to which the patentee is

entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

Remarkably, Intel's damages experts concede that the integrated graphics portion of the

accused Intel processors is not the smallest saleable patent practicing unit. *See* Ex. 7, at 209:10:18

(admitting that she does not ███████████████████████████████████

███████████████████████████████; Ex. 16 (Perryman Dep. Tr.), at 191:12-

192:12 (conceding that the integrated graphics portion ██████████████████████

███████████████████. And both acknowledge that the full scope of the claims requires

components of the accused processor that are separate and distinct from the integrated graphics

portion. *See, e.g.*, Ex. 7, at 194:11-23 (agreeing that ██████████████████ and

that the "claims are not specific only to integrated graphics"); Ex. 17 (Perryman Report), ¶¶ 56-57

(acknowledging that the asserted patents purport to resolve problems related to █████████████

█████████████████████████████). And yet

Ms. Davis disregards all of the claim elements relating to non-integrated-graphics aspects of the

accused processors in determining a proposed royalty. She testified, for example, that although

she is ████████████████████████████████████████

████████████████████ and while she is ████████████

████████████████████ she nonetheless ████████████

███████████████████████████████████████████████████████████████

███████████████████████████ Ex. 7, at 216:11-217:1.  Ms. Davis even admitted that claim 1

of the '388 Patent recites four elements, three of which are mapped to elements outside the

integrated graphics portion of Intel's processors, and yet she still ████████████████████████

█████████████████████████████████████████████ *Id.* at 410:15-411:5.

Ms. Davis' assertion that only portions of the claimed invention are "novel" is of no

moment.  After all, "[i]t is not the case that the value of all conventional elements must be

subtracted from the value of the patented invention as a whole when assessing damages.  For a

patent that combines 'old elements,' removing the value of all of those elements would mean that

nothing would remain."  *AstraZenecaAB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015);

*see also Apple Inc. v Motorola Inc.*, 757 F.3d 1286, 1317-18 (Fed. Cir. 2014) (holding that a

"district court incorrectly focused on individual claim limitations in isolation when evaluating" an

expert's damages analysis, and that the expert's analysis had to be evaluated in light of "the entire

scope of the asserted claims").  For those reasons, courts have flatly rejected arguments that that

the royalty base "should only include products accused of infringing the 'inventive' aspects of the

asserted patents," and have excluded expert testimony that "excludes revenue associated with

components alleged to infringe claimed elements that the patentee did not invent."  *ThinkOptics,*

*Inc. v. Nintendo of Am., Inc.*, No. 6:11-cv-455, 2014 WL 2859578, at *2 (E.D. Tex. June 21, 2014).

Likewise, Ms. Davis's approach cannot be reconciled with the full scope of the claimed invention

and her opinions relying solely on the graphics portion of the processors should be excluded.

### E.   Damages Should Not Be Limited To An Arbitrary Internal Accounting Rate Determined By Intel Without Regard To The Value Of XMTT's Patents

Also based on the false premise that the inventions in suit are strictly limited to the

"integrated graphics" portion of the accused processors, Intel attempts to reduce damages by a

factor of more than 50, using an ███████████████████████████████████████ ███████████████████████████████████████████████. *See* Ex. 6 (Davis Report), at 18-22 ███████████████████████████████████████ ██████████████████████████████; Ex. 17 (Perryman Report), ¶ 245 (asserting that XMTT's experts should take into account █████████████████████████████████████). According to the ██████████████████████████████████████ ███████████████████████████████████████████████████

████ *See* Ex. 18 (Rollman Dep. Tr.), at 50:23-51:22, 114:18-25.  As an internal revenue allocation tool, ████████████████████ does not accurately measure the value of any particular intellectual property—much less XMTT's intellectual property—and has no bearing on the appropriate reasonable royalty that would have resulted from a hypothetical negotiation between XMTT and Intel.

Mr. Rollman admitted that he had never even seen XMTT's patents, has no opinion regarding their validity or whether Intel infringes them, and has not evaluated whether other licenses would be comparable to a hypothetical license between Intel and XMTT.  *Id.* at 198:4-199:9, 200:5-19.  Intel's damages expert, Ms. Davis, likewise conceded that ██████████████████ ██████████████████████████████████████ Ex. 7 (Davis Dep. Tr.), at 212:18-24.  Mr. Rollman also admitted that he has no knowledge regarding Intel's patent licensing policies and that his analysis was limited to a ██████████████████████████████████ ███████████████████████████ Ex. 18, at 201:24-202:6.  Mr. Rollman also acknowledged that the ██████ figure does not relate to what customers are willing to pay for Intel's products, and he did not consider the impact of removing integrated graphics from Intel products on Intel's revenues.  *Id.* at 68:19-69:18, 74:3-14.

By relying on this rate, Intel's damages experts completely disregard the value of the asserted patents to Intel specifically, despite Intel's massive scale of infringement and resulting revenues and profit.  The rate has absolutely no bearing on the "use made of the invention by the infringer [Intel]," as required by the damages statute.  35 U.S.C. § 284.  Moreover, Intel's damages experts did not even attempt to quantify the value provided to Intel, much less take it into account.  *See* Ex. 7, at 57:7-12 ████████████████████████████████████████ ████████████████████████████████████████████████████; *see also id.* at 267:20-268:4 (confirming that she doesn't know whether the benefits could be significant or minor); Ex. 16 (Perryman Dep. Tr.), at 90:22-91:6 ████████████████████████. Consequently, Ms. Davis admitted that her damages calculations are not tied in any way to the magnitude of Intel's infringement; she testified that her numbers would not change, regardless of whether Intel sold a single infringing product or trillions of infringing products.  Ex. 7, at 67:18-69:2.  This approach fails not only the requirements of § 284, but also common sense.  The Court should exclude any testimony relying on Intel's contrived and irrelevant ████████████.

F.   **Damages Should Not Be Limited to a Fraction of the Alleged Infringement by Refusing to Fully Assume Infringement in the Hypothetical Negotiation**

Intel's expert Ms. Davis also fails to properly assume infringement, as required by the hypothetical negotiation framework.  *See Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 606 (D. Del. 1997) ("For purposes of the hypothetical negotiation, P & G's patents are deemed unquestionably valid and enforceable and will be infringed by Paragon if the parties do not negotiate a license.").  Despite Ms. Davis admitting that ████████████████████████████ ████████████████████████████████████████████████ Ex. 7 (Davis

- 23 -

Dep. Tr.), at 225:12-16, she adopted one of Intel's non-infringement positions and arbitrarily limited the damages base ***solely to processors that are shipped to the United States***, Ex. 6 (Davis Report), at 23.  This assumption resulted in her excluding all but ███ of the accused product revenue.  *See* Ex. 19 (Sullivan Reply Report), ¶ 61 & n.141.  Her approach cannot be squared with the plain language of 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention . . . infringes the patent."), much less other infringement theories alleged by XMTT under provisions such as § 271(c) and § 271(f).  Nor can it be square with Ms. Davis's own claim that her hypothetical negotiation would result in a ███████████████████████ ██████████████████████████████████████████████████ Ex. 6, at 18; *see also* Ex. 7, at 231:19-23 (admitting that ███████████████████████████████ ██████████████████████████████████████████████).

Attempting to justify this massive reduction of the royalty base, Ms. Davis relies on Intel's technical expert, Dr. Kogge, to assume that ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 6, at 23.  That approach was explicitly refuted by XMTT's technical expert.  *See, e.g.*, Ex. 20 (Conte Reply Report), ¶ 46 (stating that the ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████.  And Ms. Davis acknowledged XMTT's expert's position.  *See* Ex. 7, at 234:18-24 ██████████████████████

███████████████████████████████████████████████

Ms. Davis simply has not assumed infringement in accordance with the caselaw, which does not permit selective assumption of infringement in conflict with the patent holder's infringement allegations.  *See, e.g.*, *ThinkOptics*, 2014 WL 2859578, at *2 (excluding reasonable royalty opinion of accused infringer's damages expert's "alternative royalty base" for failing to include all accused products in royalty base).  In effect, she is arguing non-infringement, which is improper.  *See Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at *4 (E.D. Mich. July 25, 2019) ("But of course when discussing the issue of damages, ***BesTop cannot argue non-infringement*** . . . .").  While Ms. Davis couches her calculations as an "alternative analysis," Ex. 7, at 76:12-24, like the "alternative royalty base" in *ThinkOptics*, it has no place in a patent damages analysis and should be excluded.

### G. Intel's Experts Should Be Precluded From Relying On The Existence Of Intel's Own Patents To Purportedly Limit Damages

Ms. Davis asserts that in the hypothetical negotiation, one consideration would be ██████ ████████████████████████████████████████████████ Ex. 6 (Davis Report), at 54. While in theory this could be a reasonable consideration, she asserts as part of this "relative contribution" discussion that a lengthy list of ***Intel*** patents ███████████████████████ ██████  *Id.* at 54.  *See also id.* at 78 (alleging that the existence of Intel's patents impacts *Georgia-Pacific* Factor #13); 103-05 (criticizing Dr. Sullivan for not considering Intel's patents).  Those assertions about Intel's patents are unsupported and should be excluded.

In particular, one cannot opine on the "relative contribution" of two sets of patents if they do not know whether one of the sets provides any value at all or, if so, what value that set provides. Ms. Davis agrees.  At her deposition, she admitted that █████████████████████████ ███████████████████████████████████████████████ Ex. 7 (Davis

Dep. Tr.), at 265:15-22.  Yet Ms. Davis conceded that she did not 

*Id*. at 262:25-263:13.  *See also id*. at 265:3-14

. In other words, Mr. Davis seeks to make assertions about the relative value of Intel patents when she has no idea whether those patents have any value at all, or if they had value, what that value might be.  This self-serving advocacy, untethered to reliable facts, should be excluded.

Indeed, not only did Ms. Davis not perform the required quantification and apportionment, but there is no basis for her to do so because ***there is no evidence that these patents were ever used by Intel*** – not even in a single product.  In making her unsupported conclusions, Ms. Davis relies on one of Intel's non-infringement experts, Dr. Kogge, for the proposition that these Intel patents are "relevant" to the case at hand.  But "relevant" does not mean they have made any contribution to anyone, or that they have ever been used in any products.  Both Ms. Davis and Dr. Kogge studiously avoid asserting that Intel has ever practiced any of the identified patents, and at his deposition Dr. Kogge admitted he does not know whether ***any*** of these Intel patents were ever implemented into any Intel product.  Ex. 4 (Kogge Dep. Tr.), at 197:13-19.

Beyond the damages issues, it is well-settled law that "[t]he existence of one's own patent does not constitute a defense to infringement of someone else's patent." *Bio-Tech. Gen. Corp. v.*

*Genentech, Inc.*, 80 F.3d 1553, 1559 (Fed. Cir. 1996).  Accordingly, it cannot be disputed that these Intel patents are ***irrelevant*** to infringement.  Further, Intel has not elected any of these patents as prior art, and accordingly they are also ***irrelevant*** to validity.  This Court has explained that "[t]he fact that [a defendant] has patents in the same technological field is not a defense to infringement, but could mislead the jury into believing that [the defendant's] patents give it the right to practice technology that is covered by those patents even though it is also covered by [plaintiff's] patents." *Sonos, Inc. v. D&M Holdings Inc.*, No. CV 14-1330, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017).  Because of the prejudice resulting from Intel discussing its own patents, Intel must show clear relevance and only use those patents in a way that passes *Daubert*, but has failed to do so.

Ms. Davis' exact argument has been rejected by multiple courts where the Defendant provided far ***more*** support for its asserted "relevance" of their own patents than Intel has here.  For example, in *LoganTree LP v. Garmin Int'l, Inc.*, the Defendant asserted "that several of its patents cover the additional features found in its products, and thus, the required apportionment analysis must analyze the value of the other patented components." No. 17-1217, 2022 WL 6728014 (D. Kan. Oct. 11, 2022).  In making this argument, the Defendant had its technical expert provide an opinion that it was using its own patents, and then its damages expert provided an opinion that this impacted the damages plaintiff was seeking.  The Court granted Plaintiff's *Daubert* motion to exclude these opinions, and explained this opinion was unsupported and not helpful to the jury:

> [T]he Court concludes that Dr. Michalson's [technical expert] opinion is not helpful to the jury. Garmin has not pointed to any evidence showing that Dr. Finch [defendant's damages expert] performed his own apportionment analysis in critiquing LoganTree's damages claim. Instead, Dr. Finch opines that LoganTree's damages expert was required to perform an apportionment analysis and that he did not do so. ***Dr. Finch provides no analysis as to what value Garmin's patents would have within the Accused Products or the amount by which that value reduces LoganTree's damages calculation***. Instead, he only opines that LoganTree's expert

failed to properly apportion damages. This critique could be made without reference to whether Garmin's products practice Garmin's patents. Therefore, Garmin's apportionment theory is not a persuasive defense to LoganTree's motion.

*Id*. at *2.

Similarly, in *PalTalk Holdings, Inc. v. Microsoft Corp.*, the Court granted a motion to exclude evidence relating to Microsoft's own patents where Microsoft alleged its patents were relevant to damages.  No. 2:06-CV-367, 2009 WL 10677783, at *3 (E.D. Tex. Feb. 25, 2009).  The Court explained that while "Microsoft's own patents may be relevant to a reasonable royalty analysis under *Georgia Pacific*, if those patents cover some portion of the accused products. . . . Microsoft has the burden to demonstrate that it is relevant and that it bears a reasonable relationship to the issues to be presented at trial."  *Id*.  "Therefore, Microsoft has the burden to show that each of the above-referenced patents bears some relation to the accused products.  Microsoft has made no such showing. . . . As a result, Microsoft will be precluded from arguing that [its patents] . . . effect the damage models in this case."  *Id*.

For these reasons, Intel's experts should be precluded from asserting that Intel's own patents impact the damages in this case.

### H.     Intel's Experts Should Be Precluded From Asserting That Damages Are Restricted To Benefits Expressly Discussed In The Patent Specifications

Intel's experts, Dr. Kogge and Ms. Davis, erroneously assert that Intel should not have to pay damages based on any benefits obtained from infringing XMTT's patents unless those benefits are explicitly described in the specifications of the patents-in-suit.  *See e.g.*, Ex. 6, at 94 (criticizing Dr. Sullivan's analysis using die area savings as a basis for his damages calculation because ██████ ████████████████████████████████████████ ); *id*. at 99 (criticizing Dr. Sullivan's damages analysis for addressing CPU performance improvements because ████████████████████ ████████████████ does not address CPU performance); Ex. 5 (Kogge Rebuttal Report), at ¶¶ 522-23

(criticizing Dr. Conte's analysis relating to "Die Area Benefits" because ███████████████████ ███████████████████████████████████████████████████).

The patent damages statute explains that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty *for the use made of the invention by the infringer*." 35 U.S.C. § 284. "Section 284 imposes *no limitation on the types of harm resulting from infringement* that the statute will redress. The section's broad language awards damages for *any injury as long as it resulted from the infringement*." *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

In deposition, Ms. Davis conceded that she is ██████████████████ limiting damages to the benefits described by a patent, and that it is possible to calculate damages ████ ████████████████████████ Ex. 7, at 87:9-18. Ms. Davis was correct at her deposition – patent damages are not limited by the benefits mentioned in the patents themselves, and Intel's expert testimony to the contrary should be excluded.

## I.   Intel's Experts Should Be Precluded From Reducing Damages By One-Third Based On An Arbitrary "Two Out Of Three Pipelines" Theory

As one of numerous "apportionment factors" Ms. Davis uses to improperly reduce the accused revenues in this case, she relies on Intel's expert Dr. Kogge for the proposition that ████ ████████████████████████████████████████████████████████████ ███████ *See e.g.*, Ex. 6, at 23. On that premise, she eliminates one-third of the accused revenues from the case. That reduction is not based on any reliable methodology and should be excluded.

The supposed basis for Ms. Davis' reduction of damages is set forth in paragraph 660 of Dr. Kogge's rebuttal expert report. There, Dr. Kogge asserts that ███████████████████ ████████████████████████████████████ Ex. 5, at ¶ 660. He asserts that one of the three pipelines is ████████████████████████████████ *Id*. Dr.

Kogge asserts that the ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* Finally, Dr. Kogge

asserts that the third pipeline is the ████████████████ and is accused of infringement.  Dr.

Kogge therefore proclaims that ██████████████████████████████████████

██████████████████████████████████████████ *Id.* Dr. Kogge

does not provide any calculations or methodology to arrive at this "two-thirds" conclusion beyond

his opinion that there are three pipelines, and one of them, he incorrectly argues, is not accused.

Ms. Davis uses this opinion to eliminate one third of the "total relevant Intel revenues" from the

case, Ex. 6, at 23, and criticizes Dr. Sullivan for not doing the same.  *Id.* at 105, 113, 114.

These assertions are wrong on many levels.  To begin with, Intel's arguments all

erroneously presuppose that damages in this case are limited to the "integrated graphics" portion

of the accused processors.  In fact, as Intel's experts admitted at their depositions, the claims are

being read on the full processors.  *See* Ex. 7, at 186:16-19 ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████; Ex. 4, at 36:9-16 (████████████████████████████

██████████; *id.* at 37:22-38:2 ████████████████████████████████████████

████████████████████; *id.* at 188:17-22 ██████████████████████████████████

██████████████████████████    ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████.  *See e.g.*, Ex. 7, at 410:15-21

(admitting that to her understanding of claim 1 of the '388 Patent, ██████████████████████

████████████████████████████████████████████████████

████████; Ex. 4, at 38:18-40:7 (admitting that multiple claim elements are mapped to portions of Intel processors ██████████████████████████).  As explained in greater detail in Section V.D, *supra*, limiting damages in the first instance to the "integrated graphics" portion of the accused processors would be legally improper.

Moreover, Intel has no actual analysis of the value of XMTT's inventions to any of the three pipelines its experts mention, let alone quantitative analysis of their relative value—it is a plainly improper "rule of thumb."  Intel attempts to justify its "two-thirds" apportionment with Dr. Kogge's opinion that the accused functionality is actually ████████████████ Ex. 5, at ¶ 660, but "merely labelling a value 'conservative' is no substitute for a showing that there is an evidentiary foundation for the particular percentage selected—i.e., for describing the methodology used to reach that number." *Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2461551, at *18 (D. Del. May 7, 2020), *report and recommendation adopted*, No. CV 17-1616-LPS-CJB, 2020 WL 5994155 (D. Del. Oct. 9, 2020). *See also e.g.*, *Open Text S.A. v. Box, Inc.*, Case No. 13-cv-04910-JD, 2015 WL 349197, at *4, *6-7 (N.D. Cal. Jan. 23, 2015) (excluding expert's purportedly "conservative" apportionment that did not reflect "the usage and importance of the accused features[,]" where the expert provided no "formula, method, or calculation, however approximate" to justify the 15% figure used, and instead "simply announces it and proceeds to apply it to her royalty base data").  Neither Dr. Kogge nor Ms. Davis provide ***any*** evidentiary foundation for the particular percentage selected (here, 66.7%), beyond the assertion that there are three pipelines and Dr. Kogge opines that one of three is not accused of infringement.  There is no analysis as to the relative value of each pipeline beyond conclusory assertions, and Dr. Kogge admitted that he was ***not*** ██████████████ ████████████████████████████████ Ex. 4, at 84:14-85:1.

*See also id*. at 189:24-190:1 ████████████████████████████████████

████████████████████████████████

    Even if Dr. Kogge was correct that ████████████████████████████████████

████████████████████████    his "two-thirds" opinion that Ms. Davis incorporates is still

excludable under *Daubert* because there is still no method or calculation used to support the "two-

thirds" apportionment factor Ms. Davis uses in purported reliance on Dr. Kogge.  *See Guardant*

*Health*, 2020 WL 2461551, at *18 ("Moreover, even were this section of Dr. Cooper's report to

have made reference to the accused products, and even if Dr. Cooper is correct when he says that

the patented technology is 'foundational' to the accused products, this report still would not pass

muster under *Daubert*. That is because nowhere in this section does Dr. Cooper provide any factual

foundation to support the specific 50% figure that he provided to Dr. Becker.").

    "Because no concrete tie to the specific [two-thirds] value is explained," Dr. Kogge's and

Ms. Davis's opinions "lack a sufficiently reliable methodology." *Id*. at *19.  *See also Exmark Mfg.*

*Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir.

2018) (concluding that the district court erred in failing to exclude an expert's damages opinion,

where the expert "plucked the 5% royalty rate out of nowhere" because it "is not enough for an

expert to simply assert that a particular royalty rate is reasonable in light of evidence without tying

the proposed rate to that evidence"); *LaserDynamics*, 694 F.3d at 69 (rejecting apportionment that

was "plucked out of thin air based on vague qualitative notions of the relative importance of the

[accused technology]"); *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-cv-02352, 2020 WL 1274985,

at *7 (N.D. Cal. Mar. 17, 2020) (excluding apportionment analysis where the expert "failed to

provide the methodology underlying his apportionment amount or explain how he arrived at that

figure based on the facts of this case").  These opinions should be excluded.

Indeed, even setting aside the failure to justify his 2/3 apportionment, Dr. Kogge provides no reliable basis for his arbitrary breakdown of "integrated graphics" into three "pipelines" or his assertion that one of his three arbitrary divisions is not accused of infringement in the first place. Dr. Kogge himself asserts that the "display pipeline" is ███████████████████████ ████████████████████████ Ex. 5 (Kogge Rebuttal Report), at ¶ 660. Similarly, at his deposition he testified ████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

Ex. 4, at 91:3-15. ████████████████████████████████████████████

████████████████████████████████ *i.e.*, it is not a separate, non-infringing portion of the product but rather works in conjunction with the 3D/Media/Compute pipelines that Dr. Kogge admits are implicated by XMTT's infringement read and receives the processed pixels that are to be output to the screen. *See id.*, 87:13-89:3.

In sum, Intel's experts seek to reduce damages by arbitrarily labeling part of the accused processor's functionality a "display pipeline," incorrectly asserting that it is not accused of infringement (when in fact, the entire chip is accused), and then further arbitrarily allocating 1/3 of the value of graphics to that portion of the processor merely because it represents one out of three things that Dr. Kogge calls "pipelines," without any evidence supporting any of these calculations. Intel should not be permitted to mislead the jury with factually misplaced,

analytically unsupported arguments based on misrepresentations of XMTT's infringement claims.

    **J.**    **Intel's Experts Should Be Precluded From Testifying About Hypothetical Non-Infringing Alternatives That Were Not Available Or Acceptable Do Not Limit Damages**

        **1.**    **Dr. Kogge Should Be Precluded From Testifying About Alternatives Not Shown To Be Available And Acceptable**

Another of Intel's attempts to reduce damages is premised on assertions by its technical expert, Dr. Kogge, that there were ███████████████████████████████████ ████████████████████ of XMTT's patents.  Ex. 5, at ¶ 664.  In his report, Dr. Kogge conjures up multiple alleged non-infringing alternatives, but not a single one of those alleged alternatives was ever a real product that was actually on the market.  Instead, each is a hypothetical construct that Dr. Kogge says could be created by removing features of the infringing products.  *See e.g. id.* at ¶ 667 ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ *See also* Ex. 4, at 98:21-99:3 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

"Whether the accused infringer had acceptable non-infringing alternatives available to it at the time of the hypothetical negotiation may be probative of a reasonable royalty for the patented technology."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348, 2011 WL 197869, at *2 (E.D. Tex. Jan. 20, 2011).  However, "only those substitutes that the infringer proves were 'available' during the accounting period can limit a patentee's damages—substitutes only 'theoretically possible' will not."  *Id.  See also Sherwin-Williams Co. v. PPG Indus., Inc.*, No. 17-cv-1023, 2020 WL 1283465 at *9 (W.D. Pa. March 18, 2020) (granting summary judgment of no

non-infringing alternatives on both lost profit and reasonable royalty grounds because "there is not sufficient evidence that either [of the alleged alternatives] was an *acceptable, available, non-infringing, alternative product* in the market during the damages period.").

> "[W]hen an alleged alternative is not on the market during the accounting period, the court may reasonably infer that it was not available as a non-infringing alternative. . . . Mere speculation or conclusory assertions will not suffice to overcome the presumption of non-availability. . . . The court must, therefore, proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement because only those substitutes that the infringer proves were available during the accounting period can limit a patentee's damages—substitutes only theoretically possible will not."

*LaserDynamics, Inc.*, 2011 WL 197869, at *2.  Dr. Kogge fails to show in any reliable way that his alleged alternatives were actually available or that they would have been commercially acceptable.  The "non-infringing alternatives" section of his report generally consists of two stock paragraphs for each alleged alternative:

*First*, he asserts that the alternatives would be non-infringing because each would not include at least one element of the asserted claims.

*Second*, and at issue here, he asserts that each alleged alternative was available because Intel had the capability to remove each element he identifies in his first step.  *See e.g.*, Ex. 5, at

¶ 671 

; *id.* at ¶ 673

.

These conclusory assertions fail to overcome the presumption of non-availability.  At his deposition, Dr. Kogge admitted that he did not even try to analyze

to any of his hypothetical alternatives, Ex. 4, at 98:10-20, he did not address the

████████ by his hypothetical alternatives, *id*. at 97:21-98:8, and he had no idea ████████

████████████████ the accused products to implement certain of his hypothetical

alternatives.  *Id*. at 103:10-13.  All of these are elementary considerations necessary to determining

whether an alleged alternative (if available) would have been commercially acceptable.  Dr. Kogge

has failed to explain any reliable methodology supporting his assertion that these hypothetical

products were available and would have been acceptable to Intel—they are therefore not properly

considered non-infringing alternatives and should be excluded.

> **2.**   **Intel's Experts Should Be Precluded From Relying On Alternatives Not Shown To Be Available And Acceptable**

Intel's damages experts rely on Dr. Kogge's unreliable assertions discussed above.  For

example, Ms. Davis, asserts that ██████████████████████

██████████████████████ Ex. 6, at 59, and Dr. Perryman asserts that ████████

████████████████████████████████

██████████████████████ Ex. 17, at 81.

These arguments are not properly supported and should be excluded.

Ms. Davis admitted during her deposition that she has ████████████████

██████████████ Ex. 7, at 138:9-13.  *See also id*. at 281:1-6 ████████████

██████████████████████ She also

conceded that ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

Without considering these and other factors, one could not reasonably conclude that an alternative, even if available, was a commercially acceptable substitute.

Her assertions about non-infringing alternatives are based entirely on what Dr. Kogge "explained" to her.  Ex. 6, at 59-60.  But as discussed above, Dr. Kogge's opinions on this topic are unreliable and should be excluded.  For the same reasons, Ms. Davis and Dr. Perryman, who performed no independent technical analyses, lack reliable support for their opinions relating to non-infringing alternatives. *See* Ex. 7, 138:9-13; Ex. 16, 245:20-25.

### 3.  Intel's Experts Should Be Precluded From Confusing The Jury With Irrelevant Testimony

Even if Dr. Kogge's opinions were reliable—which they are not—Ms. Davis confirmed that these alleged non-infringing alternatives are ***entirely irrelevant to her analysis***.   Intel apparently want her to discuss these unproven alternatives in an attempt to confuse the jury or otherwise erroneously minimize the importance of XMTT's patents when discussing damages.

Ms. Davis admits she ███████████████████████████████████████

████████████ Ex. 7, at 140:2-6.  She further concedes that she ███████████████

███████████████████████████████████████ *Id*. at 58:6-13.   Dr. Perryman similarly performed no quantification of any impact of hypothetical non-infringing alternatives on damages.  Without any such quantification, no reliable methodology supports any of Ms. Davis' assertions about the relationship between these supposed alternatives and the amount of damages.  They should be excluded for this reason as well.

### K.  Dr. Perryman's Unreliable Methodology and Inconsistently Applied Forward-Citation Analysis Should Be Excluded

Intel's damages experts improperly attempt to limit damages through a "forward citation analysis" performed by Dr. Perryman, purporting to compare the value of the asserted patents to two other XMTT patents previously licensed to a company named ███████.  *See* Ex. 17

(Perryman Report), ¶¶ 265-81.  Dr. Perryman's citation analysis is a deeply flawed methodology completely detached from the benefits provided to Intel by XMTT's inventions, and moreover, was executed in a manner with multiple flaws that Dr. Perryman has never corrected.

Dr. Perryman asserts that his forward citation analysis provides relative values for patents based upon ████████████████████████████████████████████████ [Perryman Report], ¶ 267.  To begin with, this approach does not measure economic value and is neither a relevant nor reliable methodology for determining patent damages.  Dr. Perryman makes no effort to tie his analysis to the "use made of the invention by the infringer [Intel]" or any other entity, as required by the damages statute.  35 U.S.C. § 284; *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (approving damages analysis based on the infringer's "economic benefit from infringement by specifically focusing on the infringing features and by valuing those infringing features based on [the infringer's] own data").  Simply counting the number of times a patent has been cited says nothing about the economic value the patent has provided to anyone, let alone the infringer in this case, and is not a proper basis for assessing patent damages.  For example, a patent that was useless but amusing could attract attention and be cited far more than a patent covering valuable but confidential circuitry whose details were unknown to the public.  The method could erroneously suggest that a patent never used by anyone was worth far more than a patent used to generate billions of dollars in revenue.  *See* Ex. 16 (Perryman Dep. Tr.), at 86:2-20 (admitting that ███████████████████████████████████████ ████████████ that do not change, even if a patent that has been used a billion times has fewer citations than a patent that has never been used).

Dr. Perryman outright admitted that he made no adjustment to his analysis to consider the value of the patents to Intel.  *Id.* at 88:14-89:4.  Numerous courts have excluded forward citation

analysis as unreliable and inadmissible based on similar failures to tether the analysis to the specific facts of the case. *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 4272870, at *8 (N.D. Cal. July 14, 2015) (excluding expert's forward citation analysis testimony because "this methodology does not account for the value of the accused features as a portion of the accused products" and "the resulting apportionment demonstrates, at most, the asserted patents' relative value in the abstract, untethered to any of the facts in this case," and concluding that the expert's reliance on this methodology "has little more probative value than the '25 percent rule of thumb'"); *Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-cv-3451, 2014 WL 46997, at *3-4 (N.D. Cal. Jan. 6, 2014) (excluding attempt to use "patent citation analysis" to value patents-in-suit because "the patent valuation method is not appropriate for determining the value of individual patents"). The methodology has also been heavily criticized in academic literature. *See* Ex. 19 (Sullivan Reply Report), ¶ 92.

Patents cite other patents for myriad reasons that have nothing to do with the value of the claimed inventions, and a simple citation count reveals nothing about the importance of the claimed invention to the infringer, the revenues or profits attributable to it, or even other more reliable indicia of objective patent value, such as renewals or surviving a validity challenge—neither of which Dr. Perryman took into account. *See, e.g.*, Ex. 19, ¶ 95 (paper cited by Dr. Perryman found that patents surviving validity challenges are 42.6 times more valuable than unchallenged patents); Ex. 17, ¶ 268 n.481 ("Renewal information can be seen as a proxy for value . . . ."); Ex. 16, at 88:11-13 (did not consider any maintenance fee payments or renewal data).

Moreover, Dr. Perryman's analysis is highly unreliable in its execution. He already had to prepare an errata after XMTT's expert Dr. Sullivan identified inconsistencies in the citation counts, which Dr. Perryman blamed on ███████████████ Ex. 21 (Perryman Report Errata),

¶ 2.  But Dr. Perryman never disclosed his ███████ to XMTT, and it appears to have additional flaws.  For example, as Dr. Sullivan pointed out, Dr. Perryman applies a control for ███████ that involves excluding citations to the XMTT patents by other patents invented by Dr. Vishkin, Ex. 17, ¶ 272, but ████████████████████████████████████████████████ ████████████████████████████████ Ex. 19, ¶ 100.  Dr. Perryman acknowledged this problem but never remedied this or other errors.  *See* Ex. 16, at 50:8-55:17. Dr. Perryman also artificially limited the ████████████████████████████████ ███ *see* Ex. 21, at Ex. S1, despite acknowledging that the studies he relies upon for this approach typically ████████████████████████████████████ Ex. 17, ¶ 278.  These and other errors in the analysis as applied further demonstrate the unreliability of Dr. Perryman's approach.  *See* Ex. 19, ¶¶ 99-104.

The Court should exclude Dr. Perryman's deeply flawed forward citation analysis, as well as the calculations by Ms. Davis relying on his results, which have even further errors.  Ms. Davis claims to adopt Dr. Perryman's calculations of relative patent value to reduce her unsupported damages proposals to a fraction of what she suggests would be appropriate for Dr. Vishkin's "portfolio."  *See* Ex. 22 (Davis Supplemental Report), at 1.  But while the relative "value" of the asserted patents purportedly calculated by Dr. Perryman does not change with context as discussed above, *e.g.*, Ex. 16, at 86:2-20, Ms. Davis cites the same calculations by Dr. Perryman in various contexts that that inexplicably result in inconsistent adjustments of either 67% or 72% to her alleged "portfolio" value.  *Compare* Ex. 22. at Updated Ex. 3, Schedule 1B n.1, *with id.* at Updated Ex. 3, Schedule 1A n.2.  The analysis is flawed in concept and execution and should be excluded.

## VI.    CONCLUSION

XMTT respectfully requests the Court grant XMTT's motions.

Dated: December 22, 2022

Respectfully submitted,

**FARNAN LLP**

*/s/ Brian Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Morgan Chu (admitted *pro hac vice*)
Benjamin Hattenbach (admitted *pro hac vice*)
Anthony Rowles (admitted *pro hac vice*)
Jordan Nafekh (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199
mchu@irell.com
bhattenbach@irell.com
trowles@irell.com
jnafekh@irell.com

*ATTORNEYS FOR PLAINTIFF XMTT, INC*

Philip Warrick (admitted *pro hac vice*)
IRELL & MANELLA LLP
750 17th Street NW, Suite 850
Washington, DC 20006
Tel. (202) 777-6500
Fax (310) 203-7199
pwarrick@irell.com